PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 21 2003**

**PATRICK FISHER**
**Clerk**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

RICKY W. ALCORN,

Defendant - Appellant.

No. 02-3189

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 01-CR-10098-JTM)

Cyd Gilman, Assistant Federal Public Defender, Wichita, Kansas, for Defendant - Appellant.

Debra L. Barnett, Assistant United States Attorney (Eric F. Melgren, United States Attorney, and Brent I. Anderson, Assistant United States Attorney, on the briefs), Wichita, Kansas, for Plaintiff - Appellee.

Before **LUCERO** , Circuit Judge, **McWILLIAMS** and **ANDERSON** , Senior Circuit Judges.

**ANDERSON** , Circuit Judge.

Defendant Ricky W. Alcorn appeals his conviction, following a jury trial, for willfully and unlawfully wrecking a train, in violation of 18 U.S.C. § 1992. We affirm.

**BACKGROUND**

At approximately 11:00 p.m. on August 29, 2001, Alcorn drove his pick-up truck north along Greenwich Road in Sedgwick County, Kansas. As he approached 95th Street, he encountered two barricades stretching the width of the road and indicating that the road was closed. Alcorn drove around the barriers and proceeded towards a construction project in which L.G. Pipe Construction Company was rebuilding an 80-foot section of the railroad crossing near 95th Street and Greenwich Road.

As Alcorn approached the railroad crossing, he realized that there was an eighteen-inch trench between the end of the roadbed and the newly replaced railroad tracks, which had not yet been filled in. The trench was eight to ten inches deep. As Alcorn drove across the trench between the roadbed and the tracks, his truck became stuck. He then got out of his truck and walked some 120 feet to a large excavator which had been used by the construction crew. The crew had left the excavator with its excavating arm stretched across the road as an additional barrier to traffic. The arm, when fully extended, stretches twenty-five

feet from the front of the machine. The arm also has a large bucket attached at its end, which is fifty-four inches wide and forty-eight inches tall. The operating cab of the excavator rotates so that the operator always faces in the direction of the excavating arm.

Alcorn knew how to use the machine, as he had worked previously at construction jobs. Alcorn found the key which the operator of the excavator had hidden, got into the cab, started the machine, turned on its lights, raised the arm and proceeded towards his truck, intending to use the arm to push his truck out of the trench. He maneuvered the excavator behind his truck, and pushed the truck out of the trench with the arm. He then backed the excavator up, dropped the arm and bucket to the ground, turned off the excavator's lights, wiped his fingerprints off the inside of the cab, and returned the key to the compartment in which it had been hidden. The bucket lay partially across one of the railroad tracks.

Alcorn walked north towards his truck, passing by the bucket. He acknowledged at trial that he had seen the bucket as he walked past it. [1] He got

---

[1]On cross-examination, the following exchange occurred:

Q. You saw where the bucket was at, correct?
A. Yes. Didn't look like it was on the tracks.
Q. You saw where it was at?
A. I must have. I might not have.
Q. You walked right by it, didn't you?
A. I ran. I ran to my pickup to leave.

(continued...)

into his truck, which by now had two flat tires, drove around additional barricades, got stuck again, but finally freed his truck and proceeded towards the intersection of 95th Street and Greenwich Road. When he saw the headlights of a car approaching on 95th Street, he pulled behind a barricade, turned off his lights, and waited for the car to pass.

Alcorn realized that he could not drive the car because of the two flat tires. Accordingly, after passing several houses as he drove north on Greenwich Road, he eventually stopped and parked his truck at the house of Kathy Willis. He left a note on Ms. Willis's door, apologizing for leaving his truck in her front yard and stating that he would be back soon to pick it up. He did not leave his name or phone number. Alcorn called a friend, John Martin, on his cell phone and asked him to pick him up.

While waiting for Martin to arrive, Alcorn heard the crash of a train as it hit the excavator bucket. The 7,000 foot long train had hit the bucket going 55 miles per hour and derailed, causing a total of more than $3.2 million in damage. When Martin arrived, he and Alcorn drove to the scene of the crash. When Martin suggested they call 911 on Alcorn's cell phone, Alcorn said he did not

[1](...continued)
Q. You ran right by it, didn't you, sir?
A. Yes.

R. Vol. VII at 308.

want to. They then left the scene of the derailment. Later, Alcorn discussed with Martin various stories he could tell the police about the incident.

Alcorn was indicted on one count alleging that he "did willfully and unlawfully, derail, disable and wreck a train," in violation of 18 U.S.C. § 1992. R. Vol. IV at tab 11. At trial, the court gave the following instructions to the jury:

### INSTRUCTION NO. 11

"Willfully," as that term is used in 18 [U.S.C.] [§ ] 19[9]2, means the acts charged in the indictment were committed voluntarily, deliberately and intentionally, even if defendant did not know his or her acts constituted a specific crime.

Id. at tab 42.

### INSTRUCTION NO. 12

A willful act is done knowingly. An act is done "knowingly" if defendant was aware of the act, realized what he was doing or what was happening around him, and did not act or fail to act because of ignorance, mistake, or accident. The government is not required to prove defendant knew these acts or omissions were unlawful. You may consider evidence of defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.

Id.

### INSTRUCTION NO. 13

The question of intent is also a matter for you, as jurors, to determine.
In every crime there must exist a union or joint operation of act and intent.

"Intent" means more than the general intent to commit an act. The government must prove that defendant knowingly did an act which the law forbids.

"Intent" is a state of mind. Because you cannot look directly into a person's mind, the only reasonable way to determine intent is to consider all the facts and circumstances shown by the evidence and determine from that evidence defendant's intent at the time in question.

Id.

INSTRUCTION NO. 14

The intent required to violate [18 U.S.C. § 1992] is that a person act willfully to derail, disable or wreck a train. The government is not required to prove that a specific intent to derail, disable or wreck a train existed at the time of the events herein. In other words, you are not required to find the defendant acted with the intent to derail, disable or wreck a train.

Willfulness may be shown by evidence of the natural, probable consequences of the defendant's actions.

Id.

After deliberations began, the jury submitted a question to the court seeking clarification of Instruction No. 12. The court conferred with the parties and responded, without objection, as follows: "An act is done knowingly if it's done voluntarily and intentionally and not out of mistake or accident or other innocent reason." R. Vol. VII at 337. After deliberating further, the jury asked two more questions: (1) "If Rick failed to check whether the bucket was on the track, is that considered to be a willful act, in terms of the bucket being left on the track?"; and (2) "If he could have made sure he didn't obstruct the track and chose not to

look or take any other action is that willful?" R. Vol. IV at tab 43. Alcorn

requested that the court instruct the jury "Do you find or not find that Ricky

Alcorn knew that he placed the bucket of the backhoe on the railroad track?" R.

Vol. VII at 340. [2] The court refused that request.

The court then proposed giving the jury a modified Allen instruction, to

which Alcorn objected, arguing that the jury's questions to the court indicated

that they were confused about the meaning of "willful" in the context of this case,

and that the modified Allen instruction "merely pressures [the jury] to make a

decision with this fundamental misunderstanding being considered." Id. at 342.

The court overruled that objection, and gave the jury the following instruction:

INSTRUCTION NO. 21

As I told you during instructions yesterday, your verdict must
represent the considered judgment of each juror. In order to return a
verdict, it will be necessary that each juror agree thereto. Your
verdict must be unanimous.

In this light, it is your duty as jurors to consult with one
another and to deliberate with a view to reaching an agreement, if
you can do so without violence to individual judgment. Each of you
must decide the case for yourself, but do so only after an impartial
consideration of the evidence with your fellow jurors. In the course
of your deliberations, do not hesitate to re-examine your own views
and change your opinion if convinced it is erroneous. But do not
surrender your honest conviction as to the weight or effect of the

_____

[2]As we discuss more fully, infra, Alcorn suggested several variations of the
instruction he wished the court to give, all of which contained the basic idea
expressed in the language quoted.

evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

I have faith in your judgment, whatever your ultimate verdict.

You are not partisans. You are judges–judges of the facts. Your sole interest is to ascertain the truth from the evidence in this case.

R. Vol. IV at tab 42. The court also responded to the jury's two questions as

follows:

The instructions, as supplemented in the response to jury question number one, adequately define "willful" actions. Please carefully review those instructions again. It is your responsibility to determine if defendant willfully caused the derailment of the train.

R. Vol. VII at 343. The court went on to say:

When I say the derailment, I'm including the whole statute–the wreck, the damage to the train. I think if you go back and take a look at the definition of willfully, you take a look at the definition of knowingly, and finally the supplement to that definition of knowing that we sent into you last night, that should guide you in terms of determining whether an act is willful or not.

I would remind you as well that while we have defined those terms for you in terms of the statute, you are still to apply–and its part of the instructions–your common sense and knowledge and experience as you consider all the things that you're looking at in this case. We are not going to be able to tell you because it's your job to determine from what you have whether something is willful or not. We can't tell you whether it is or whether it isn't. If we could do that, we would probably be telling you what the verdict should be in the case. Again, that is–as difficult as it may seem, may even seem overwhelming at times–your responsibility. We'll give you as much help as we possibly can, but we can't ultimately decide the case for you, which is what we would, in effect, be doing if we say, "Yes, this is willful conduct." "No, that's not willful conduct." Because it is

-8-

ambiguous to some extent in the sense that there could be some question with respect to whether an act was willful or not, depending on what the circumstances are. So you need to take a look at the whole case again, what all the circumstances are, and make a determination here with respect to the charge against the defendant based on the information that you heard during the trial, the evidence and based upon the instructions I have given you.

Id. at 343-44.

The jury resumed deliberations after receiving the above instructions, and returned a guilty verdict later that day.

Alcorn then filed a motion for judgment of acquittal, which the district court denied in a written memorandum order. The court stated, "The jury could and did determine beyond a reasonable doubt that the defendant's actions willfully wrecked a train. As in Youts, the jury was required to find and did find that the defendant knowingly set in motion the events which caused the train to wreck." Mem. Order at 7, R. Vol. IV at tab 48.

The court subsequently denied Alcorn's request for a downward departure under the Sentencing Guidelines, finding that Alcorn's case fell within the heartland of cases to which the particular guideline applied. The court accordingly sentenced Alcorn to 46 months imprisonment, followed by three years of supervised released, and directed Alcorn to make restitution in the amount of $3,210,519.56.

Alcorn appeals, arguing the district court erred in (1) refusing to provide a "substantive answer to the second set of questions submitted by the jury regarding the intent that must be proved in order to convict, and instead, referred the jurors to previous instructions," Appellant's Br. at 34; (2) giving an _Allen_ instruction in response to the jury's questions; (3) refusing to give a theory of the defense instruction, as requested by Alcorn; and (4) refusing to depart downward in sentencing Alcorn under the Sentencing Guidelines.

## DISCUSSION

### I.  Jury Instructions

Alcorn's basic defense at trial was that he did not realize that he had left the excavator arm's bucket on the railroad track, and therefore he did not "willfully" derail the train, as required by 18 U.S.C. § 1992.  He further argues that the jury's questions during deliberations revealed that they were confused about the meaning of the term "willful" in this case, that the court's response to the jury's questions failed to eliminate that confusion, and that the jury's confusion was exacerbated by the modified _Allen_ instruction and by the denial of Alcorn's requested theory of the defense instruction.

"We review the jury instructions de novo to determine whether, as a whole, the instructions correctly state the governing law and provide the jury with an

-10-

ample understanding of the issues and applicable standards." United States v. Fredette, 315 F.3d 1235, 1240 (10th Cir. 2003) (quotation omitted). "The instructions as a whole need not be flawless, but we must be satisfied that, upon hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them." Id. at 1240-41 (quotation omitted). Further, while we review de novo the jury instructions as a whole, "the district court's decision to give a particular jury instruction is reviewed for abuse of discretion." Id. at 1241.

"We review whether an Allen instruction was erroneously given on a case-by-case basis with a view towards determining whether the instruction had a coercive effect on the jury." United States v. Rodriguez-Mejia, 20 F.3d 1090, 1091 (10th Cir. 1994). "Some of the factors we consider in making this determination include: (1) the language of the instruction, (2) whether the instruction is presented with other instructions, (3) the timing of the instruction, and (4) the length of the jury's subsequent deliberations." Gilbert v. Mullin, 302 F.3d 1166, 1173 (10th Cir. 2002) (quotation omitted). Finally, with respect to Alcorn's theory of defense argument, "[w]e review de novo whether a district court committed reversible error in failing to submit a requested theory of defense instruction." United States v. Bindley, 157 F.3d 1235, 1241 (10th Cir. 1998).

Alcorn first argues that the district court erred in failing to give a specific "substantive" answer to the jury's second set of questions, and instead simply

referred the jury to the instructions already given which defined the term "willful." He argues that those prior definitions were inadequate and that their inadequacy stemmed from the district court's misinterpretation of United States v. Youts, 229 F.3d 1312 (10th Cir. 2000).

In Youts, the defendant boarded an idling locomotive, drove it to a place near his house, put the train in reverse at full throttle and jumped off the train. The driverless train rounded a curve at fifty-six miles per hour and derailed. Agreeing with the few other circuits which have addressed the matter, we rejected the defendant's argument in Youts that § 1992 requires proof of a specific intent to disable, derail or wreck a train. We held, rather, that "the willfulness language in section 1992 is best understood as a knowledge requirement." Id. at 1316. We further held that "'[a] person acts knowingly with respect to a material element of an offense when[,] . . . if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.'" Id. (quoting Model Penal Code § 2.02(2)(b)(ii)). Thus, "[t]he natural, probable consequences of an act can satisfactorily evidence the state of mind accompanying it." Id. at 1317. As applied in Youts, we held that "[t]he natural, probable, and practically certain consequences of sending a driverless locomotive down curving tracks at full speed will be the result punished by the statute." Id. We concluded our analysis in Youts by stating, "Mr. Youts knowingly set in

motion—literally and figuratively—the events which caused the train to wreck. That is all section 1992 requires." Id.[3]

We hold that the instructions given to the jury in this case adequately and accurately defined the intent required to find a violation of § 1992 and adequately defined the term "willful," as our circuit has interpreted the intent requirement of § 1992. As instruction No. 12 stated, "[a] willful act is done knowingly." R. Vol. IV at tab 42. The instruction, in turn, defined "knowingly" as where the "defendant was aware of the act, realized what he was doing or what was happening around him, and did not act or fail to act because of ignorance, mistake or accident." Id. Instruction No. 14 correctly informed the jury that the government need not prove a specific intent to derail, but that "[w]illfulness may be shown by evidence of the natural, probable consequences of the defendant's actions." Id. Thus, just as in Youts the natural, probable consequence of sending a driverless train at full speed around a corner was derailment, in this case the natural, probable consequence of leaving an excavating bucket partially across a railroad track is derailment of an oncoming train.

---

[3]While the district court expressed concern that Youts lowered the level of intent required under § 1992 so that something akin to negligence, as opposed to a general criminal intent, satisfies the statute's intent requirement, we do not agree. As indicated above, Youts requires willful and knowing conduct, which can be demonstrated when the "natural, probable and practically certain consequences of an act" result in the derailment of a train. We read the instructions given in this case as adequately stating that intent requirement.

-13-

Alcorn argues that the jury's questions indicate the jurors were confused about the definition of willfulness and knowing. We disagree. The jury's questions indicate that jurors were having difficulty applying those instructions to the particular facts of this case. But the fact that jurors submit questions indicating they are having difficulty applying particular instructions to the facts of the case does not necessarily mean that the instructions are themselves faulty. Rather, the jury's questions suggest they were focused precisely on the crucial issue in this case—whether the government proved that Alcorn willfully left the bucket on the rail, with the inevitable result that a train hitting the bucket would derail.

We conclude that, considering the instructions as a whole, they "correctly state the governing law and provide the jury with an ample understanding of the issues and applicable standards." Fredette , 315 F.3d at 1240. Given the adequacy of the instructions, the district court did not err in referring the jury to them, particularly the definition of willful provided therein, in response to the jury's second set of questions. And we conclude that, while this was a very close case, there was sufficient evidence to support the jury's conclusion that Alcorn willfully and knowingly left the bucket on the rail. [4]

_____

[4]Although Alcorn denied that he realized he had left the bucket on the rail, there was evidence that visibility that night was good, that Alcorn was familiar

(continued...)

Alcorn next argues that the court erred in giving a modified Allen instruction along with its response to the jury's second set of questions, and in refusing to give the specific theory of the defense instruction Alcorn requested.

We have long sanctioned the use of Allen instructions, provided that neither the content of the charge nor the context in which it is given render the instruction unduly coercive.[5] The content of the instruction in this case conforms to Allen charges we have previously upheld. It was a "modified" charge, in that it was directed to all members of the jury, not just "those holding the minority view." United States v. Arney, 248 F.3d 984, 988 (10th Cir. 2001).

Additionally, the timing of this instruction does not compel the conclusion that it was coercive. While we have indicated that it is preferable for an Allen instruction to be given along with all the other jury instructions, it may be given

---

[4](...continued)
with construction equipment and knew how to run the excavator, that he saw the bucket after he had lowered it on to the rail, and that his actions immediately following his use of the excavator were consistent with an attempt to cover up illicit activity. Thus, while the jury evidently struggled with this case, it ultimately concluded, consistent with the instructions, that Alcorn had willfully left the bucket on the rail. We cannot say that no reasonable jury could have reached that conclusion.

[5]"With respect to the coerciveness of the charge actually given, this circuit has adopted a case-by-case approach, . . . considering such factors as '(1) [t]he language of the instruction[;] (2) its incorporation with other instructions; and (3) the timing of the instruction.'" United States v. McElhiney, 275 F.3d 928, 940 (10th Cir. 2001) (quoting United States v. Porter, 881 F.2d 878, 888 (10th Cir. 1989)) (further citations omitted). As indicated above, we also consider the length of the jury's subsequent deliberations. See Gilbert, 302 F.3d at 1173.

-15-

after the jury has commenced deliberations.  See id. at 988-89 ("Although this court has stated that the preferred practice is to issue an Allen charge prior to jury deliberations along with other jury instructions, we have found on numerous occasions that Allen charges given to a jury during its deliberations were not unduly coercive.") (citation omitted).  And such an instruction may be given even without any indication that the jury is deadlocked.  See Darks v. Mullin, No. 01-6308, 2003 WL 1861527 at *10 (10th Cir. April 11, 2003) ("A court may give a supplemental instruction *sua sponte* before counsel requests one, even without any indication from the jury that it is deadlocked.").  Alcorn particularly argues that the court's giving of the Allen charge in response to the jury's second set of questions was coercive and therefore reversible error.  We disagree.  While the jury was struggling with a critical issue in the case, the court properly referred the jury to its instructions, and reminded the jury that its task was to carefully apply those instructions to the facts of the case.  Thus, the fact that the Allen charge was given in connection with the court's response to the jury's second set of questions is not fatal. [6]

Considering our prior case law, the Allen instruction in this case was not coercive.  It contained the cautionary language to each juror not to "surrender

---

[6]It is not clear from the record how long the jury deliberated after receiving the Allen charge.

your honest conviction as to the weight or effect of the evidence," but it did not contain the embellishments we have found problematic in prior cases. Cf. McElhiney, 275 F.3d at 944. Neither the content of the instruction nor the circumstances in which it was given convince us that it was impermissibly coercive.

Alcorn also argues the court should have given his theory of defense instruction to the jury. "A criminal defendant is entitled to an instruction on his theory of defense provided that theory is supported by some evidence and the law." United States v. Haney, 318 F.3d 1161, 1163 (10th Cir. 2003) (en banc). "However, a 'theory of the defense' instruction is not required if it would simply give the jury a clearer understanding of the issues." United States v. Wolny, 133 F.3d 758, 765 (10th Cir. 1998). Furthermore, such an instruction "is required only if, without the instruction, the district court's instructions were erroneous or inadequate." Id.; see also United States v. Hollis, 971 F.2d 1441, 1452 (10th Cir. 1992) ("While the defense is entitled to an instruction as to his theory of defense if there is evidence to support it, the court is not required to give an instruction that misstates the law or that is already covered by other instructions.") (citation omitted).

Alcorn asked the court to give either of the following two instructions on his theory of defense: "If you found that [Alcorn] did not know that he placed the

bucket of the backhoe on the tracks, you must find him not guilty," R. Vol. VII at 339, or "Do you find or not find that Ricky Alcorn knew that he had placed the bucket of the backhoe on the railroad tracks?"      Id. at 340.  Alcorn's testimony made it clear to the jury that his defense, as his proposed instructions state, was that he did not realize he had left the bucket on the rail.      [7]  Other jury instructions in this case informed the jury that, in order to find Alcorn guilty, they would have to find that he willfully derailed the train, and that a "willful" act is an act done "knowingly," which in turn requires that Alcorn be "      aware of the act, realize[] what he was doing or what was happening around him, and . . . not act or fail to act because of ignorance, mistake, or accident      ." (emphasis added).  His proposed instructions were simply another way to express the willful and knowing requirement–i.e., that he be "aware," "realize[] what he was doing" and "not act or fail to act because of ignorance, mistake, or accident."  Indeed, his theory of defense was, in essence, that the government had simply failed to prove a critical element of its case.  Other instructions fully covered the elements of the charged offense, including the willful and knowing requirement.  "There is no requirement that a trial judge must follow the exact language from the jury instructions offered

[7]Alcorn did not include a transcript of closing arguments as part of the record on appeal.  We assume, however, that his closing argument reiterated his defense, as expressed in the instructions he wanted the court to give the jury, that he left the bucket on the track negligently, inadvertently, accidentally or mistakenly.  The jury obviously rejected that assertion.

-18-

by the defendant." United States v. Pack, 773 F.2d 261, 267 (10th Cir. 1985). Nor is there a requirement that the court give an express instruction on a defendant's assertion that the prosecution has failed to establish an element of its case. The district court did not err in refusing to submit either of the instructions Alcorn proposed on his theory of defense.

## II. Refusal to Depart Downward

Alcorn asked the district court to depart downward based on an argument that the district court's interpretation of the level of intent required by § 1992, as interpreted in Youts, took the case outside of the heartland of cases to which the relevant guideline applied. The district court refused, stating, "I think Mr. Alcorn's conviction is sufficient to satisfy the heartland requirement of the guidelines, and the other information that came out during the course of the trial does not have any bearing on moving Mr. Alcorn out of the heartland." R. Vol. VII at 364.

"Courts of appeal cannot exercise jurisdiction to review a sentencing court's refusal to depart from the Guidelines, either upward or downward, unless the court refused to depart because it interpreted the Guidelines to deprive it of the authority to do so." United States v. Fortier, 180 F.3d 1217, 1231 (10th Cir. 1999). Further, "[a]mbiguous statements made by district court judges must be

treated 'as though the judge was aware of his or her legal authority to depart but chose instead, in an exercise of discretion, not to depart.'" United States v. Miranda-Ramirez, 309 F.3d 1255, 1258-59 (10th Cir. 2002) (quoting Fortier, 180 F.3d at 1231). The district court clearly realized it had the authority to depart downward, but decided that Alcorn's case did not warrant it. In that situation, we lack jurisdiction to entertain his appeal from that refusal.

## CONCLUSION

For the foregoing reasons, we AFFIRM Alcorn's conviction.